# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 19-CV-2521 (LDH) (RER)

———————————

CHALAMO KAIKOV,

Plaintiff,

VERSUS

ARIHAY KAIKOV, PACIFIC 2340 CORP., ROYAL A&K REALTY GROUP, INC.,
A&E.R.E. MANAGEMENT CORP., NY PRIME HOLDING LLC, AND AG
REALTY BRONX CORP.,

Defendants.

———————————

**REPORT & RECOMMENDATION**

October 5, 2020

———————————

**TO THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE**

**RAMON E. REYES, JR., U.S.M.J.:**

Plaintiff Chalamo Kaikov ("Chalamo" or "Plaintiff") brought this diversity action under

28 U.S.C. § 1332(d) alleging civil RICO, fraud, conversion, and unjust enrichment claims against

Defendants: (1) Arihay Kaikov ("Arihay"), (2) Pacific 2340 Corp., Royal A & K Realty Group

Inc., A&E.R.E. Management Corp., NY Prime Holding LLC, and AG Realty Bronx Corp., all

entities allegedly operated by Arihay Kaikov (collectively, "Corporate Defendants"), and (3)

Arihay's lawyer and the lawyer's law firms (collectively, "Law Firm Defendants"). (Dkt. No. 20

("Am. Compl.")). Arihay and the Corporate Defendants filed this Motion to Dismiss, (Dkt. No. 30

("Mot. to Dismiss")), at the same time the Law Firm Defendants filed a separate motion to dismiss.

1

(Dkt. No. 31). The Honorable Jack B. Weinstein held a hearing at which he granted the Law Firm Defendants' motion to dismiss and referred this Motion to Dismiss to me for a report and recommendation. (Dkt. No. 52).[1] The case was subsequently reassigned to Your Honor. For the reasons stated herein, I respectfully recommend that Defendants' Motion to Dismiss be granted with respect to Plaintiff's (1) Civil RICO claims, (2) common law fraud claims, (3) conversion claims, (4) request to impose a constructive trust, and (4) attempt to reverse pierce the corporate veil. However, I respectfully recommend Defendants' Motion to Dismiss Plaintiff's unjust enrichment claim be denied.

## **BACKGROUND**

### I.  Pre-Formation of 911 Realty Corp.

In December 2012, Defendant Arihay Kaikov approached his cousin, Plaintiff Chalamo Kaikov, with a business proposal. (Am. Compl. ¶ 28). In sum, Arihay wanted to purchase, renovate, and sell real property for a profit. (Am. Compl. ¶¶ 29, 32, 38–40). Arihay represented that together, he and Chalamo "would turn up quick profits of at least 200% to 300% on their joint investment." (Am. Compl. ¶ 33). Chalamo accepted the proposal, providing Arihay with an initial investment of $100,000, and the parties entered into an oral agreement. (Am. Compl. ¶¶ 38–39).

Arihay and Chalamo agreed to be "partners, each equally responsible for all capital obligations to acquire and manage the investment properties, and sharing equally any profits from the sale of the renovated properties." (Am. Compl. ¶ 32). In addition, Arihay would manage the business, "locate, negotiate contracts of sale, and acquire the properties on their behalf and timely

---

[1] In that same Order, Judge Weinstein requested I produce a report and recommendations on damages. (Dkt. No. 52 ¶ 3). This Report and Recommendation only addresses the referred Motion to Dismiss. Should Your Honor wish I make a report and recommendation on damages, which would require an evidentiary hearing, I will do so separately.

inform Chalamo about the properties which would be purchased, the details of renovation progress, and detail all expenditures of the invested money." (Am. Compl. ¶ 31).

In October 2013, Arihay visited Chalamo in Moscow. (Am. Compl. ¶ 44). There, Arihay reported that Chalamo's investment had turned a large profit and asked Chalamo to contribute another $200,000, promising even higher returns. (Am. Compl. ¶ 45). However, during the meeting, Arihay "would not disclose to Chalamo which properties returned profit on Chalamo's investment." (Am. Compl. ¶¶ 44–45). Despite Arihay's refusal, Chalamo made the additional $200,000 investment. (Am. Compl. ¶ 47).

"Throughout the beginning of 2014, Chalamo and Arihay had numerous telephone conversations" where Chalamo asked Arihay to detail the properties in which his investment was made and when the profits would be distributed. (Am. Compl. ¶ 49). Each time he was asked, Arihay "refuse[d] to provide any information related to the properties he bought or alleged profits." (Am. Compl. ¶ 50).

## II. Post-Formation of 911 Realty Corp.

Given the lack of information provided, Chalamo "no longer felt comfortable" working with Arihay on an oral agreement and "requested that some formal relationship be made." (Am. Compl. ¶ 51). Accordingly, in April 2014, Chalamo and Arihay agreed to form a corporation, 911 Realty Corporation ("911 Realty"), "where Chalamo and Arihay would be *de facto* 50-50% owners."[2] (Am. Compl. ¶¶ 53, 55). The parties agreed that 911 Realty would "hold titles and own the properties in which [Arihay] claimed he invested Chalamo's money and to account for joint investments and expenses." (Am. Compl. ¶ 52). In addition, Chalamo's son, Khanan Kaikov,

---

[2] Nowhere in the Amended Complaint is the term "*de facto* 50-50% owners" defined.

("Khanan"), would be appointed President of 911 Realty, acting as Chalamo's agent, as Khanan was residing in New York and Chalamo in Moscow. (Am. Compl. ¶ 54).

Over the next two years, Arihay refused to transfer titles of the properties that Chalamo had invested in to 911 Realty, alleging they were tied up in litigation.[3] (Am. Compl. ¶ 57). In addition, in May 2015, Chalamo gave Arihay another $100,000 "as further investment." (Am. Compl. ¶ 56).

In November 2016, Chalamo traveled to New York for a meeting with Arihay. (Am. Compl. ¶ 59). At the meeting, Arihay presented a list of ten properties purchased between 2013 and 2015 that he had invested Chalamo's money in.[4] (Am. Compl. ¶¶ 60–61, 79, 89, 98, 111, 123). Because, as mentioned previously, Arihay had still not transferred ownership of the properties to 911 Realty, the parties again agreed the titles and/or deeds for the ten properties would be transferred to 911 Realty. (Am. Compl. ¶ 64).

After the meeting, the parties "opened a bank account for 911 Realty."[5] (Am. Compl. ¶ 65). Khanan—Chalamo's son and President of 911 Realty—"was to be a signatory on [911 Realty's bank] account on behalf of Chalamo." (Am. Compl. ¶ 65). In addition, Khanan managed 911 Realty's "bank account and kept [an] accounting of Chalamo's investments on Chalamo's behalf." (Am. Compl. ¶ 73).

During this time Arihay again requested Chalamo make an additional contribution. (Am. Compl. ¶ 66). Chalamo consented and on November 23, 2016, Chalamo wired $500,000 to

---

[3] Chalamo later discovered that, in fact, the titles of the properties had been distributed among the various Corporate Defendants, which "were solely under [the] control and management of Arihay." (Am. Compl. ¶ 58).

[4] This list of properties was later put in writing through text messages between Arihay and Khanan. (Am. Compl. ¶ 63).

[5] The Amended Complaint does not clarify how 911 Realty operated between April 2014 and November 2016 without a bank account.

Arihay's wife's bank account to be used for 911 Realty's expenses.[6] (Am. Compl. ¶¶ 67–68). In December 2016, Arihay transferred the deeds of two of the ten properties discussed above to 911 Realty. (Am. Compl. ¶¶ 75, 127).

"From December 2016 through part of 2018, Arihay used 911 Realty's bank account to pay renovation expenses for the [i]nvestment [p]roperties." (Am. Compl. ¶ 71). Chalamo provided "[m]ost of the funds required for renovations . . . on [an] 'as needed' basis." (Am. Compl. ¶ 72). Chalamo alleges that in regard to at least four of the ten properties, "Arihay used his own contractors for renovations and fraudulently claimed that renovation expenses were much higher than what had actually been spent in order for Plaintiff to provide funds that Arihay then converted for his own profit." (Am. Compl. ¶¶ 77, 88, 110, 122).

In January 2017, one of the ten properties Chalamo invested in—but was never transferred to 911 Realty—was sold by Arihay. (Am. Compl. ¶¶ 87, 89, 92). Arihay told Chalamo he would receive a portion of the profits but failed to provide an accounting of costs and expenses and failed to pay Chalamo his share.[7] (Am. Compl. ¶¶ 93, 94).

A little more than a year later, in April 2018, one of the ten properties held by 911 Realty was sold with the knowledge and consent of Chalamo. (Am. Compl. ¶ 80). However, once again, Arihay failed to provide Chalamo with his share of the profits. (Am. Compl. ¶ 81). At the same time, Arihay sold one of the ten properties that had not been transferred to 911 Realty without the knowledge or consent of Chalamo. (Am. Compl. ¶¶ 101–02). Arihay did not pay Chalamo his share of those profits either. (Am. Compl. ¶¶ 103–04).

---

[6] The Amended Complaint does not explain why Chalamo wired funds for 911 Realty to Arihay's wife's bank account instead of the 911 Realty bank account.

[7] Throughout the Amended Complaint it is unclear whether Plaintiff is alleging that he did not receive *any* profits from Arihay or that he received some profits but not his "full" share. (Am. Compl. ¶¶ 81, 93–94, 104, 116).

Shortly thereafter, in May 2018, Chalamo confronted Arihay regarding his failure to transfer the remaining eight properties to 911 Realty and "return the investment funds." (Am. Compl. ¶ 132). Arihay refused to transfer the remaining properties and made threats against Chalamo and his sons. (Am. Compl. ¶¶ 133–38).

In June 2018, Arihay "made a series of [unauthorized] withdrawals from the business account of 911 Realty in Chase Bank, totaling $116,650." (Am. Compl. ¶ 139). The Amended Complaint alleges that during these transactions, Arihay held himself out to be a signatory on the account when he was not. (Am. Compl. ¶ 139). The Amended Complaint further alleges that the money Arihay withdrew from the account was a portion of the profit from one of the sales of property that belonged to Chalamo. (Am. Compl. ¶ 140).

In July 2018, Arihay "caused to incorporate a company" in order to fraudulently transfer the deed of the only remaining property held by 911 Realty. (Am. Compl. ¶ 127). "The ownership to the title is currently subject to a lawsuit pending" in state court. (Am. Compl. ¶ 127).

In August 2018, Arihay sold another of the ten properties without Chalamo's knowledge or consent. (Am. Compl. ¶ 115). Again, Arihay failed to provide Chalamo with his "full" share of the profits. (Am. Compl. ¶ 116).

On April 24, 2019, Chalamo brought this suit against Arihay, Corporate Defendants, and Law Firm Defendants, alleging Civil RICO claims, common law fraud, conversion, and unjust enrichment. (Dkt. No. 1). On September 6, 2019, Chalamo filed an Amended Complaint. (Am. Compl.). On November 5, 2019, Arihay and Corporate Defendants filed this Motion to Dismiss. (Mot. to Dismiss). On November 6, 2019, the Law Firms filed their Motion to Dismiss. (Dkt. No. 31). On February 4, 2020, Judge Weinstein, who was previously assigned to this case, held a

motion hearing at which he, among other things, granted the Law Firm's Motion to Dismiss and referred this Motion to Dismiss by Arihay and Corporate Defendants to me. (Dkt. No. 52).

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) "[a] claimant must plead 'enough facts to state a claim to relief that is plausible on its face.'" *United States v. Tishman Constr. Corp.*, No. 12-CV-03862 (DLI) (RER), 2017 WL 9481015, at *4 (E.D.N.Y. Feb. 2, 2017) (citing Fed. R. Civ. P. 12(b)(6), *R & R adopted by* 2017 WL 1093190 (Mar. 23, 2017); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The court must "accept as true all well-pleaded factual allegations in the [pleadings] and draw all inferences in the [non-moving party's] favor." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 505 (S.D.N.Y. 2013) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006)). "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Luna v. North Babylon Teacher's Organization*, 11 F. Supp. 2d 396, 401 (E.D.N.Y. 2014) (quoting *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal quotation marks omitted). Indeed, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Defendants assert the allegations in Plaintiff's Amended Complaint do not pass muster under Rule 12(b)(6). Specifically, Defendants challenge the alleged oral agreement as subject to the Statute of Frauds and argue that Plaintiff's Civil RICO, common law fraud, conversion, and unjust enrichment claims should be dismissed. In addition, Defendants challenge Plaintiff's eligibility for a constructive trust remedy and the spreading of liability via reverse piercing of the corporate veil. I address each argument in turn.

I. **The Statute of Frauds Applies**

Chalamo alleges that he and Arihay made an oral agreement wherein Chalamo would provide Arihay with funds to purchase, renovate, and sell real property and they would both split the profits of the sales. (Am. Compl. ¶¶ 29, 32, 38–40). Defendants argue that because Plaintiff alleges an *oral* agreement, enforcement of the agreement is barred by the Statute of Frauds because "the alleged transactions all deal with conveyances and contracts concerning real property." (Dkt. No. 30-8 ("Defs.' Mem. in Supp.") at 11). While Plaintiff acknowledges that the parties operated on an oral agreement, he submits that the Statute of Frauds does not apply because the agreement was to create a joint venture. (Dkt. No. 32 ("Pl.'s Mem. in Opp'n") at 17–18).

Defendants are correct that the oral agreement between Chalamo and Arihay is subject to the Statute of Frauds. Under New York law, "[a]n estate or interest in real property . . . or in any manner relating thereto, cannot be created" without a writing. N.Y. Gen. Oblig. L. § 5–703); *see also Wells v. Hodgkins*, 54 N.Y.S.3d 740, 743 (N.Y. App. Div. 2017) (finding the Statute of Frauds applied to an alleged oral agreement for "the sale of plaintiff's shares of stock in a corporation whose only asset was an interest in real property"). Plaintiff is correct that the Statute of Frauds does not apply to a joint venture. *Suttongate Props. Ltd. v. Obadia*, No. 09-CV-1629 (RRM) (SMG), 2010 WL 11651620, at *3 (E.D.N.Y. Sept. 14, 2010); *see also Dobbs v. Vornado, Inc.*, 576 F. Supp. 1072, 1077 (E.D.N.Y. 1983). However, Plaintiff fails to properly allege that a joint venture existed. Therefore, I respectfully recommend the oral agreement be deemed void and any breach of contract claim[8] be dismissed.

Under New York law, a joint venture is defined by five elements:

(1) two or more persons must enter into a specific agreement to carry on an enterprise; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a

---

[8] Plaintiff does not explicitly bring a breach of contract cause of action but to the extent the facts in the Amended Complaint make out such a claim, it should be dismissed.

contribution of property, financing, skill, knowledge or efforts; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

*Ely v. Perthuis*, No. 12 Civ. 1078 (DAB), 2013 WL 411348, at *6 (S.D.N.Y. Jan. 29, 2013) (quoting *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67–68 (2d Cir. 2003)). "The absence of any one factor is fatal to the establishment of a joint venture." *DIRECTV Grp, Inc. v. Darlene Invs., LLC*, No. 05 Civ. 5819 (WHP), 2006 WL 2773024, at *5 (S.D.N.Y. Sept. 27, 2006) (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004)) (internal quotation marks omitted).

While Chalamo may adequately allege some of the elements of a joint venture, he fails significantly on the fourth. Chalamo describes the alleged venture as one where Arihay had virtually full control of the business. Chalamo alleges that he and Arihay agreed Arihay would manage the business, "would locate, negotiate contracts of sale, and acquire the properties on their behalf and timely inform Chalamo about the properties which would be purchased, the details of renovation progress, and detail all expenditures of the invested money." (Am. Compl. ¶¶ 31, 39). In fact, Chalamo alleges that one of the reasons he found Arihay's proposal so attractive was the opportunity to make a profit "without Chalamo having to be involved" in much of the business. (Am. Compl. ¶ 36). Chalamo's role was essentially that of a passive investor, only providing investment funds, with no decision-making authority. (Am. Compl. ¶¶ 32, 40).

Accordingly, Chalamo fails to sufficiently plead he and Arihay agreed to form a joint venture. *See Slabakis v. Schik*, 84 N.Y.S.3d 45 (N.Y. App. Div. 2018) (dismissing complaint for failure to adequately plead necessary element of joint venture in real property where plaintiff alleged "that management and control of the enterprise was to be completely vested in defendant); *In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. 699, 723 (Bankr. S.D.N.Y. 2018) (dismissing claim

of joint venture where plaintiff failed to plead "any degree of co-management or control over the transaction, which is an indispensable element of a joint venture) (collecting cases).

Because Chalamo fails to adequately plead a joint venture, the Statute of Frauds applies and the oral agreement between Chalamo and Arihay is void. As such, to the extent Chalamo alleges a breach of contract claim, I respectfully recommend it be dismissed.

## II.  Civil RICO Claims Should be Dismissed

Defendants advance five arguments in support of their motion to dismiss Plaintiff's RICO claims: (1) the claims are barred by the applicable four-year statute of limitations (Defs.' Mem. in Supp. at 12–13); (2) Plaintiff lacks standing to bring RICO claims (*id.* at 13–14);[9] (3) Plaintiffs' fraud allegations lack the requisite specificity (*id.* at 14–15); (4) Plaintiff fails to plead RICO continuity (*id.* at 15–16); and (5) the RICO allegations themselves fail to state a claim under 18 U.S.C. §§ 1962(a), (b), (c) or (d). (*Id.* at 16–23). Because the allegations in the Amended Complaint fail to establish that Plaintiff has suffered a domestic injury under RICO, and he therefore lacks standing, I will address only that issue and respectfully recommend that Plaintiffs' RICO claims be dismissed.

### A.  Legal Standards

A plaintiff's standing to bring civil RICO claims derives from 18 U.S.C. § 1964(c), which provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive provisions. 18 U.S.C. § 1964(c). "To show that an injury resulted by reason of the defendant's action, a plaintiff must show that the defendant's violations were a proximate cause of the plaintiff's injury, *i.e.*, that there was a direct

---

[9] Defendants argue that Plaintiff lacks RICO standing because (1) he is not a shareholder, owner or agent of 911 Realty, and therefore cannot sue for any RICO injury 911 Realty may have sustained; and (2) he has otherwise not suffered a "domestic" injury. (Defs.' Mem. in Supp. at 13-14).

relationship between the plaintiff's injury and the defendant's injurious conduct." *DeFalco v. Bernas*, 244 F.3d 286, 329 (2d Cir. 2001) (internal quotation marks and citations omitted). As the Supreme Court has made clear, 18 U.S.C. § 1964(c) "requires a civil RICO plaintiff to allege and prove a *domestic injury* to business or property and does not allow recovery for foreign injuries." *RJR Nabisco, Inc. v. European Cmty.*, – U.S. –, 136 S. Ct. 2090, 2111 (2016) (emphasis added). After *RJR Nabisco*, putative RICO violations are to be construed narrowly to adhere to the well-established presumption against RICO extraterritoriality. *Id.* at 2108.

While the Supreme Court has yet to provide a definitive framework for resolving the question of whether a particular injury is domestic, the Second Circuit has offered some guidance in *Bascuñán v. Elsaca*, 874 F.3d 806 (2d Cir. 2017) ("*Bascuñán I*") and *Bascuñán v. Elsaca*, 927 F.3d 108 (2d Cir. 2019) ("*Bascuñán II*"). *Bascuñán I* and *II* involved individual and corporate citizens and residents of Chile; the main plaintiff, Jorge Yarur Bascuñán, was the sole beneficiary of his family's multi-million-dollar estate who had hired the main defendant, his cousin Daniel Yarur Elsaca, to manage the estate. Through a series of convoluted transactions undertaken mostly from Chile, Elsaca allegedly looted $64 million from the estate and Bascuñán brought suit under RICO in the United States District Court in the Southern District of New York. After the district court dismissed the case for failure to plead a domestic injury under RICO, the Second Circuit reversed and remanded.

In *Bascuñán I* the Second Circuit identified four potential RICO injuries, two involved the fraudulent transfer of money from the plaintiffs' foreign bank accounts to accounts in the United States ("Dividend Scheme" and "General Anacapri Investment Fraud Scheme"), where it was then stolen. 874 F.3d at 811–13. The other two injuries involved the theft of money ("New York Trust Account") and bearer shares ("BCI Share Theft"), respectively located in the plaintiffs' bank

account and safety deposit box in New York. *Id.* The Second Circuit concluded that the New York Trust Account scheme and BCI Share Theft were "domestic" injuries under *RJR Nabisco*, because the plaintiffs' property was inside the United States and in the plaintiffs' possession when it was stolen. *Id.* at 820–24. The Circuit held, however that the Dividend Scheme and General Anacapri Investment Fraud Scheme were not domestic injuries because the money was never in plaintiffs' possession or control in the United States, from where it was stolen. *Id.* at 818–19. After remand, additional discovery and amendment of the pleadings, the district court again dismissed the complaint for, among other reasons, the failure to allege a domestic injury. *Bascuñán II*, 927 F.3d at 115–16.

In *Bascuñán II* the Second Circuit again reversed. The Circuit again found that the New York Trust Account and BCI Share Theft schemes constituted domestic injuries as money and bearer shares were stolen out of plaintiffs' accounts in the United States. *Id.* at 117. Based on additional facts adduced during discovery, the Court found that with one exception the Dividend Scheme and General Anacapri Investment Fraud Scheme also involved fraudulent transfers out of the *plaintiffs'* accounts in the United States, and therefore constituted domestic injuries as well. *Id.* at 118–20.

From *Bascuñán I* and *II* several guiding principles can be gleaned for determining whether an injury to tangible property is foreign or domestic under RICO: !

(1) whether an injury is foreign or domestic depends on "the particular facts alleged in each case" and "the specific type of injury alleged," *Bascuñán I*, 874 F.3d at 817–18;

(2) where a plaintiff alleges multiple RICO injuries, each alleged injury must be examined separately to determine whether there is standing to sue thereon, *id.* at 818;

(3) the location of the RICO injury is not the location of the defendant's conduct giving rise thereto, but the location of the property that was harmed, *id.* at 820–21;

(4)  a defendant's use of bank accounts located within the United States to effectuate, facilitate or conceal the theft of property located outside of the United States does not establish a domestic injury, *id.* at 819; and,

(5)  where a RICO plaintiff fails to allege the location and ownership of the accounts in which property was harmed, he has failed to allege a domestic injury, *Bascuñán II*, 927 F.3d at 120.

## B.  Analysis

Despite its length and references to a multitude of alleged improper acts, the Amended Complaint does not specifically identify the RICO injuries of which Plaintiff complains. (*Id.* at ¶ 154) ("Injury to Property: Plaintiff was directly and proximately harmed by predicate acts of racketeering, including wire fraud, bank fraud, and Travel Act violations, which resulted in *ascertainable financial losses* to the Plaintiff.") (emphasis added). This failure leaves the Court to ferret out precisely what those injuries are, and whether they are domestic, *i.e.*, injuries to *Plaintiff's* business or property *within the United States*.

At its core, the business arrangement alleged in the Amended Complaint contemplated that Plaintiff would contribute money toward Arihay's purchase and rehabilitation of distressed properties in the United States in exchange for the right to receive fifty percent of the profits derived from the sales thereof. (Am. Compl. ¶¶ 28–32). Arihay would handle the purchase, rehabilitation, and sale of the properties, admittedly in the United States, with no input from Plaintiff. (*Id.* ¶ 31).[10]  According to the Amended Complaint, Plaintiff had no direct proprietary interest in the properties themselves, or the profits. In other words, Plaintiff would be a passive investor in the business, with a purported right to receive a percentage of future profits, if any.

---

[10] Admittedly, Arihay would advise Plaintiff of the status of the business, including identifying which properties were purchased, the status of the rehabilitation and sale, *etc.* (Am. Compl. ¶ 31) ("Arihay promised that he would . . . timely inform Chalamo about the properties which would be purchased, the details of renovation progress, and detail all expenditures of the invested money.").

Later, when Plaintiff was unhappy with the business structure the parties agreed that a corporation—911 Realty—would be created, in which Plaintiff would hold a "*de facto*" fifty percent ownership interest, to facilitate the purchase, ownership and sale of properties. (*Id.* ¶¶ 52–55). From these allegations, the Court can glean only two potential domestic RICO injuries: (1) loss of his investment funds, and (2) the failure to receive the profits expected from sale of investment properties. These are the core allegations of the quid pro quo of the purported business arrangement, Plaintiff would contribute investment funds, Defendant Arihay would control the business and remit to Plaintiff half of any profits.

In his opposition to Defendants' Motion Plaintiff focuses on three factors to establish that his business or property was injured in the United States and therefore he has RICO standing: "(1) Defendants misappropriated Plaintiff's investment funds after they were transferred to the United States; (2) Defendants misappropriated profits from the sale of the investment properties (purchased with Plaintiff's funds) located in the United States; (3) 911 Realty, the corporation where Plaintiff holds a 50% equitable interest and that was supposed to hold titles to the investment properties, is a domestic corporation." (Pl.'s Mem. in Opp'n at 24). These allegations are insufficient to establish a domestic injury.

### 1. Misappropriation of Plaintiff's Investment Funds

Plaintiff's reliance on Defendants' misappropriation of investment funds after they were transferred to the United States as establishing a domestic injury is misplaced for two reasons.

First, even after *Bascuñán I* and *II,* the domestic injury analysis "turns on the location of the plaintiff's property when it was harmed, not on the location where the defendant's misconduct took place." *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F.Supp.3d 319, 347 (S.D.N.Y. 2019) (citing *Bascuñán I*, 874 F.3d at 819); *see also Humphrey v. GlaxoSmithKline PLC*, 905 F.3d

14

694, 706 (3d Cir. 2018) (noting the "general consensus among the courts that have had to apply *RJR Nabisco*" is that the location of the injury is not the location of the conduct) (citing, among others, *Bascuñán I*, 874 F.3d at 820–21)). Thus, Defendants' conduct alone, even if it occurred in the United States, does not establish that Plaintiff suffered a domestic injury.

Second, the Amended Complaint is almost entirely devoid of a description of the ownership and location of the accounts involved in the transfers of Plaintiff's investment funds, which allegedly were "misappropriated." (Am. Compl. ¶¶ 47, 56, 74, 97, 107, 120). Plaintiff's failure to identify the location of and who owned the accounts involved in the transfers is fatal to his claim that he suffered a domestic injury. Indeed, *Bascuñán II*, the only fraud scheme that the Second Circuit held did not sustain a domestic injury, involved accounts to which plaintiff could not identify the location or ownership. 927 F.3d at 120 ("Bascuñán concedes that he does not know where the injuries caused by the Sham Management Fees Scheme took place because he does not know the locations of the accounts from which Elsaca withdrew the relevant funds. . . *Because the SAC does not allege that these injuries took place in the United States, the district court correctly held that this scheme is impermissibly extraterritorial as pleaded*.") (emphasis added). Because Plaintiff does not explicitly identify the owners or locations of the accounts out of and into which the investment proceeds were transferred, he fails to properly allege a domestic injury. *Id.*; *Newman v. Jewish Agency for Israel*, No. 16-CV-7593, 2017 WL 6628616, at *4 (S.D.N.Y. Dec. 28, 2017) (finding vague allusion to financial accounts, without explicit reference to any account's location, fails to make out a domestic RICO injury). There are simply no allegations in the Amended Complaint, let alone proof, that any misappropriation of investment funds was directly from *Plaintiff's accounts in the United States*, as it was in *Bascuñán I* and *II*. 874 F.3d at 820–21,

15

927 F.3d at 115–17.[11] The only explicit reference to the location and ownership of accounts involved in misappropriation of investment funds indicates that it occurred after transfer from Plaintiff's account in Russia to Defendant Arihay's wife's account in the United States. (Am. Compl. ¶ 68). In such situations, the RICO injury occurs where the plaintiff relinquishes control over his property, here Russia and not the United States. *E.g., Martin Hilti Fam. Tr.*, 386 F.Supp.3d at 347 (Plaintiff's RICO injury occurred in Liechtenstein "[b]ecause [it] relinquished control over its money in Liechtenstein—when it authorized a transfer of funds from its Liechtenstein bank account to [defendant's] New York account."); *see also Malvar Egerique v. Chowaiki*, No. 19 Civ. 3110 (KPF), 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (finding RICO "injury occurred in Spain, when [plaintiff] relinquished control over" artwork and shipped it to New York, where it was subsequently misappropriated).

Ultimately, Plaintiff does not identify any account in the United States over which he had custody and control and from which his investment funds were misappropriated. Accordingly, Plaintiff fails to establish standing based on the alleged misappropriation of his investment funds "after they were transferred to the United States." (Pl.'s Mem. in Opp'n at 24).

### 2. Misappropriation of Profits

The alleged misappropriation of profits also does not establish that Plaintiff suffered a domestic injury. Again, although the misappropriation may have occurred in the United States, the focus of the RICO domestic injury requirement is not on a defendant's conduct, but on the injury to plaintiff's property in the United States. *Martin Hilti Fam. Tr.*, 386 F.Supp.3d at 347. As discussed above, Plaintiff does not establish that a joint venture was properly created, and therefore

---

[11] In this regard, Plaintiff's reliance on *Bascuñan I* and *II* as supporting his standing is misplaced. (Pl.'s Mem. in Opp'n at 24).

he has not established any enforceable proprietary interest in the investment properties or the profits derived therefrom. He also does not allege that the profits ever existed in any account in the United States over which he had a proprietary interest. Simply put, Plaintiff does not adequately allege that he has any tangible property in the United States over which he had custody or control.

According to Plaintiff's description of the parties' agreement, it was never expected that Plaintiff would directly own the properties themselves, the sale of which would generate the profits. (Am. Compl. ¶¶ 31–40). Rather, and at most, Plaintiff expected to receive a fifty percent share of profits. (Pl.'s Mem. in Opp'n at 24, 34, 40). Here, based on Plaintiff's own allegations and the reasonable inferences that can be drawn therefrom, the injury to his right to receive fifty percent of the profits from the venture, even if enforceable, occurred in Russia, where he resided and expected he would be paid. *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018) ("It is well understood that a party experiences or sustains [RICO] injuries to its intangible property at its residence."). While the residence of a RICO plaintiff is not the only factor guiding the determination of whether a domestic injury has occurred, it is relevant and "perhaps even dispositive—in determining whether certain types of business or property injuries constitute a domestic injury." *Bascuñán I*, 874 F.3d at 824. Here, where Plaintiff had no direct ownership interest in the properties in question, or the profits derived from sales thereof, his residence in Russia is dispositive.[12] Plaintiff lacks standing to bring a RICO claim because he does not establish that he suffered a direct injury to his business or property in the United States.

---

[12] Plaintiff also cannot establish a domestic injury by relying on the allegation that 911 Realty, a New York corporation in which he allegedly holds a fifty percent "*de facto*" interest, (Am. Compl. ¶ 53), was supposed to hold titles to the investment properties. The allegations fall short of establishing Plaintiff's actual ownership interest in 911 Realty. Although Plaintiff alleges the parties agreed that 911 Realty would be created and Plaintiff would be a "*de facto*" fifty percent owner, (Am. Compl. ¶ 53), and that 911 Realty was in fact subsequently created, (*id.* ¶ 55), there is no express allegation that Plaintiff then became an actual shareholder of 911 Realty. This is probably why Plaintiff retreats from the "*de facto*" characterization of his ownership of 911 Realty in the Amended Complaint and indicates in his opposition to the Motion to Dismiss that he has an "equitable" interest in 911 Realty. (Pl.'s Mem. in Opp'n at 24).

* * *

In all, based on the facts alleged in the Amended Complaint, and drawing all reasonable inferences in his favor, Plaintiff does not establish that he suffered a domestic injury as required by *RJR Nabisco*. Even if fraudulently duped, Plaintiff was a passive investor who contributed his investment income from Moscow and had no proprietary interest in any property in the United States. Plaintiff simply has not suffered a domestic injury within the meaning of RICO and the applicable precedent. Accordingly, I respectfully recommend that Plaintiff's RICO claims be dismissed for lack of standing.

Based on this recommendation I will not address whether Plaintiff has sufficiently alleged facts to satisfy the other elements required to state a RICO claim. *Stewart v. Loring Estates, LLC*, No. 18-CV-2283 (MKB) (SMG), 2020 WL 3002363, *9 (E.D.N.Y. Feb. 26, 2020) (recommending dismissal of RICO claims as untimely without reaching issue of whether amended complaint failed to state a claim), *adopted sub nom*, 2020 WL 1231783 (E.D.N.Y. Mar. 13, 2020).

## III.  Common Law Fraud

The Amended Complaint contains a long and winding list of grievances against Defendants, including countless allegations of fraud.[13] Defendants argue Plaintiff fails to "allege *any* of the required elements for a common law fraud claim," fails to meet the specificity requirement for pleading fraud, and fails to allege justifiable reliance. (Defs.' Mem. in Supp. at

---

Further, even if Plaintiff were an owner of 911 Realty, he would lack standing to sue for any RICO injuries 911 Realty may have sustained, and any injuries he sustained vis-à-vis 911 Realty would neither be direct nor proximate. *E.g., Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir.1993) (finding a fifty percent shareholder of a corporation lacks standing to sue for a RICO claim of the corporation).

[13] In its current structure, Plaintiff's Amended Complaint is potentially in violation of Federal Rule of Civil Procedure 10(b)'s requirement to state "each claim founded on a separate transaction or occurrence . . . in a separate count." Fed. R. Civ. P. 10(b).

23) (emphasis in the original). For the reasons discussed below, I respectfully recommend that Defendants' Motion to Dismiss Plaintiff's fraud claims be granted.

"On a motion to dismiss, a complaint pleading a claim of fraud must allege each of the elements of the claim as defined by state law, and must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *Dessert Beauty, Inc. v. Platinum Funding Corp.*, No. 06 Civ. 2279 (SAS), 2006 WL 3780902, at *5 (S.D.N.Y. Dec. 26, 2006) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)). Under New York law, the elements of common law fraud are: "(1) a material misrepresentation or omission of fact, (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Travelex Currency Servs., Inc. v. Puente Enters., Inc.*, 449 F. Supp. 3d 385, 395 (S.D.N.Y. 2020) (internal quotation marks omitted) (quoting *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)). "Rule 9(b) requires that a complaint '[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Corley v. Vance*, 365 F. Supp. 3d 407, 456 (S.D.N.Y. 2019) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).

I will address the fraud claims chronologically.

### A. Initial Investment in December 2012

In December 2012, while Plaintiff was in New York, Defendant Arihay approached Plaintiff seeking $100,000 to purchase, renovate, and sell real property. (Am. Compl. ¶¶ 28–32). In return, Defendant Arihay would split the profits of the sales with Plaintiff. (Am. Compl. ¶ 32). Plaintiff agreed and provided Defendant Arihay $100,000. (Am. Compl. ¶ 38). Plaintiff "alleges

that Defendant Arihay made false representations . . . intended to deceive Plaintiff into investing into" the alleged "joint venture." (Pl.'s Mem. in Opp'n at 40).

To begin, Plaintiff fails to identify which, if any, of Defendant Arihay's statements were false, thus failing to meet the first element of fraud. The closest Plaintiff comes to alleging that any of Defendant Arihay's representations were false are two sentences, based on "information and belief," regarding the absence of a written agreement between the parties.[14] First, Chalamo alleges that "Arihay did not want to suggest that Chalamo give him a loan, because promise of ownership in [a] joint venture would be more enticing and suggest higher illusory profits than a loan." (Am. Compl. ¶ 34). Second, Chalamo alleges "Arihay did not want to put anything in writing because he never intended to return money to Chalamo." (Am. Compl. ¶ 42).

The fact that Defendant Arihay asked Plaintiff for an investment instead of a loan does not amount to a false statement. The allegation may point to Defendant Arihay's intent to defraud, but it does not explain what is false about the statement. Plaintiff's reference to "illusory profits" could indicate that Defendant Arihay's misrepresentation was his statement that if Plaintiff invested the money, he and Arihay would make quick and high profits. (Am. Compl. ¶ 33). Yet Plaintiff never alleges that Defendant Arihay's statement about the potential profits was false. Even if he did, the statement is one "of prediction or expectation," which "will not sustain an action for fraud." *Magnacoustics, Inc. v. Integrated Comput. Sols., Inc.*, No. 17-CV-4967 (RER), 2020 WL 4041310, at *5 (E.D.N.Y. July 17, 2020) (quoting *D'Onofrio v. Mother of God with Eternal Life*, 79 N.Y.S.3d 902, 909 (N.Y. Sup. Ct. 2018) (internal quotation marks and citations omitted).

Regarding the allegation that Defendant Arihay "never intended to return money to Chalamo," the Amended Complaint comes closer to alleging a fraud claim. (Am. Compl. ¶ 42).

---

[14] At no point in the Amended Complaint does Plaintiff allege that Defendant Arihay refused to put the agreement in writing or was averse to a written agreement.

Assuming Plaintiff means the material misrepresentation was that Defendant Arihay would split the profits of the property sales with Plaintiff, the Amended Complaint successfully alleges the first element of fraud. However, the claim still fails because "[u]nder New York law, false statements indicating an intent to perform under a contract are insufficient to support a claim of fraud."[15] *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996)). In fact, "New York law makes clear that a plaintiff may not circumvent the Statute of Frauds by 'simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder.'" *Zeising v. Kelly*, 152 F. Supp. 2d 335, 346 (S.D.N.Y. 2001) (quoting *Best Western Int'l v. CSI Int'l Corp.*, 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994)) (collecting cases); *see also Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 410–11 (S.D.N.Y. 2016) (quoting *Massey v. Byrne*, 977 N.Y.S.2d 242, 243 (N.Y. Sup. Ct. 2013) ("Nor are plaintiffs permitted to 'avoid the statute of frauds by calling the breach of contract claim a fraud claim.'"). Therefore, Plaintiff has no fraud claim insofar as he alleges that Defendant Arihay "never intended to return money to" Plaintiff despite promising to do so as part of their alleged, and now void, oral agreement.

While a plaintiff "may not rely on defendants' purported misrepresentation of *future intent* to perform," a plaintiff can state a fraud claim based on "misrepresentations of *presently existing facts* made to induce plaintiff to" act. *Ningbo Prods. Imp. & Exp. Co., Ltd. v. Eliau*, No. 11 Civ. 650 (PKC), 2011 WL 5142756, at *7 (S.D.N.Y. Oct. 31, 2011) (first emphasis in original, second emphasis added). However, "to bring such a claim, 'a plaintiff must set forth *specific facts* indicating that the promisor never intended to honor his or her obligations at the time the promise

---

[15] "This rule applies even where the plaintiff does not assert a claim for breach of contract." *PetEdge, Inc.*, 234 F. Supp. 3d at 491–92 (collecting cases).

was made.'" *Beter v. Murdoch*, No. 17 Civ. 10247 (GBD), 2018 WL 3323162, at \*8 (S.D.N.Y. June 22, 2018) (quoting *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12 Civ. 8205 (RWS), 2013 WL 3943267, at \*11 (S.D.N.Y. July 31, 2013)) (emphasis in original). Indeed, to make out a fraud claim based on a defendant's "undisclosed intention to breach" a promise, "proof of such intention must be based on more than a mere showing of nonperformance." *Soper v. Simmons Intern., Ltd.*, 632 F. Supp. 244, 249 (S.D.N.Y. 1986).

Here, outside of nonperformance, Plaintiff fails to allege any specific facts that support an allegation that Defendant Arihay had "a preconceived and undisclosed intention" of not providing Plaintiff any profits. *Beter*, 2018 WL 3323162, at \*8. Moreover, as mentioned previously, the Amended Complaint does not even make clear whether Defendant Arihay failed to distribute any profits or that profits were distributed and Plaintiff does not believe they amount to his full share.

**B. October 2013 Investment**

Plaintiff argues that Defendant "Arihay's representations to Plaintiff about the purported success of the joint venture and the need for additional investment at their meeting in Moscow . . . induced Plaintiff to give Arihay an additional $200,000." (Pl.'s Mem. in Opp'n at 40; Am. Compl. ¶ 46). Once again, Plaintiff fails to allege the first element of fraud: a material misrepresentation. Plaintiff himself does not allege that this statement was false. Even in his briefing papers Plaintiff describes Defendant Arihay's statements as "representations" as opposed to "misrepresentations." Indeed, the Amended Complaint merely alleges that Defendant Arihay told Plaintiff his initial investment made "a total profit of $200,000." (Am. Compl. ¶ 44). There are no facts pled that indicate this statement was false.

Even if Plainitff had alleged any misrepresentation, it is unclear whether his reliance on statements from Defendant Arihay was reasonable.[16] Plaintiff alleges that during this discussion, Defendant Arihay refused to disclose "which properties returned profit on [Plaintiff's] investment." (Am. Compl. ¶ 45). Despite the refusal, Plaintiff gave Defendant Arihay $200,000 more "with the same conditions." (Am. Compl. ¶ 47). However, such refusal is highly suspect especially where the parties had allegedly agreed that Defendant Arihay would "timely inform [Plaintiff] about the properties which would be purchased, the details of renovation progress, and detail of all expenditures of the invested money." (Am. Compl. ¶ 31).

### C. April 2014 Promise

In April 2014, Plaintiff argues that "to induce Plaintiff to make additional investments and delay repaying the investments already made, Arihay falsely promised Plaintiff that he would transfer titles and deeds for the investment properties to 911 Realty." (Pl.'s Mem. in Opp'n at 40). Here, Plaintiff again attempts to disguise a breach as a fraud claim. This attempt holds even less water as Plaintiff fails to allege that Defendant Arihay had a contemporaneous, preconceived notion not to honor his promise. In addition, Plaintiff argues Defendant Arihay's promise was meant to induce Plaintiff to make additional investments, yet, according to the Amended Complaint, Plaintiff did not make an additional investment until over one year later. (Am. Compl. ¶ 56). Such an extended duration between the statement and the injury makes the damages element tenuous.

Moreover, in the months leading up to April 2014, Plaintiff repeatedly asked Defendant Arihay to provide information on the identity of the properties and a timeline of when the proceeds

---

[16] "Ordinarily, the third element of justifiable reliance is not one suitable to resolution on a motion to dismiss." *Luong v. Ha The Luong*, 67 Misc.3d 1210(A) (N.Y. Sup. Ct. Apr. 28, 2020). Still, here, with each alleged interaction reliance becomes less and less justifiable.

would be distributed. (Am. Compl. ¶ 49). In response, Defendant Arihay repeatedly declined to provide the information. (Am. Compl. ¶ 50). In fact, Plaintiff admits that he "no longer felt comfortable" working with Defendant Arihay and therefore "requested that some formal relationship be made." (Am. Compl. ¶ 51).

### D.  November 2016 Promise

In November 2016, Plaintiff argues Defendant "Arihay once again falsely promised to transfer titles to ten identified investment properties to 911 Realty and induced Plaintiff to give him" $500,000. (Pl.'s Mem. in Opp'n at 41). As discussed repeatedly above, a breach of a promise is not fraud. In the rare case that it is, one must plead contemporaneous facts indicating a preconceived notion not to honor the promise. Here, as above, Plaintiff does not even provide a conclusory allegation that Defendant Arihay held a present intent not to perform.

Similarly problematic is that between 2014 and 2016, Plaintiff alleges Defendant "Arihay refused to transfer any titles to 911 Realty." (Am. Compl. ¶ 57). It is difficult to contend that Plaintiff acted reasonably when he provided Defendant Arihay with $500,000 based on Arihay's recommitment to a promise he has already failed to keep for over two years.

### E.  Miscellaneous Frauds

Finally, Plaintiff alleges various ancillary fraud claims throughout his Amended Complaint. Like much of the Amended Complaint, these "miscellaneous" claims are difficult to discern. However, none rise to the level of an adequately pleaded fraud claim. For example, Plaintiff alleges that in relation to four of the ten relevant properties, on "information and belief, Arihay used his own contractors for renovations and fraudulently claimed that renovation expenses were much higher than what had actually been spent in order for Plaintiff to provide funds that Arihay then converted for his own profit." (Am. Compl. ¶¶ 77, 88, 110, 122). Here, Plaintiff fails

24

to meet any of the Rule 9(b) specificity requirements. Plaintiff does not allege any specific statements made, who Defendant Arihay relayed such information to, or where and when he provided the information. Plaintiff similarly fails to allege information relating to who was damaged and how and whether their reliance was reasonable.

* * *

After carefully combing through Plaintiff's extensive and often ambiguous allegations of fraud, I cannot find one adequately pleaded claim. Plaintiff's major fraud allegations fail because they are merely claims for breach of the void oral agreement recast as fraud claims. Moreover, in relation to each of the alleged fraud claims, Plaintiff fails to allege sufficient particularity under Rule 9(b) not to mention many of the primary elements of fraud, like a material misrepresentation of fact. Therefore, I respectfully recommend that Defendants' Motion to Dismiss Plaintiff's fraud claims be granted.

## IV.  Conversion

Plaintiff alleges Defendants converted his investments, the investment properties, and the profits from the sale of the investment properties. (Pl.'s Mem. in Opp'n at 43–44; Am. Compl. ¶¶ 204–07). Defendants argue Plaintiff fails to plead conversion because he is not entitled to any of the properties and because he is attempting to "sustain an action for conversion based upon the nonperformance of an alleged contract." (Defs.' Mem. in Supp. at 25). Ultimately, Plaintiff fails to plead conversion and I respectfully recommend that Defendants' Motion to Dismiss Plaintiff's conversion claims be granted.

To plead a claim of conversion "under New York law a plaintiff must show '(1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of

its condition or to the exclusion of the plaintiff's rights." *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, No. 10-CV-1762 (RER), 2013 WL 696651, at *5 (E.D.N.Y. Feb. 26, 2013) (quoting *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 267 (S.D.N.Y. 2011)).

### A. Conversion of Investments

Plaintiff fails to plead that Defendants converted his investment funds because the funds are not specifically identifiable and because Plaintiff fails to allege Arihay treated the funds differently than previously agreed upon. While money can be converted in certain circumstances, "that money must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." *James v. Arango*, No. 05-CV-2593 (TCP) (AKT), 2011 WL 1594832, at *6 (E.D.N.Y. Mar. 28, 2011) (quoting *Robert Smalls Inc. v. Hamilton*, No. 09 Civ. 7171 (DAB) (JLC), 2010 WL 3238955, at *8 (S.D.N.Y. July 19, 2010)) (internal quotation marks omitted).

Here, the investment money is not specifically identifiable. Although Plaintiff alleges specific sums, excepting one instance, he does not allege where the money he gave to Arihay went. Rather, he simply alleges that he "agreed to invest," "gave" and "provided" funds to Arihay. (Am. Compl. ¶¶ 38, 47, 56). The one exception is Plaintiff's $500,000 wire to Arihay's wife's bank account. (Am. Compl. ¶ 68). Otherwise, Plaintiff fails to allege whether he provided these funds by cash, check, or wire. Nor does Plaintiff allege where the funds went other than "to Arihay." The Court cannot even make an inference in Plaintiff's favor as to where the money went because 911 Realty did not have a bank account until November 2016, (Am. Compl. ¶ 65), and even then, Plaintiff wired money to Arihay's wife's bank account instead. (Am. Compl. ¶ 68). As such, the allegations are not enough to establish these funds are specifically identifiable.

Moreover, even if Plaintiff had alleged enough facts to find the money was specifically identifiable, Plaintiff fails to allege Defendant Arihay treated the investment funds in a different manner than that agreed upon. *See Petrone v. Davidoff Hutcher & Citron, LLP*, 150 A.D.3d 776, 777 (N.Y. App. Div. 2017) (quoting *East Schodack Fire Co., Inc. v. Milkewicz*, 140 A.D.3d 1255, 1256 (N.Y. App. Div. 2016)) ("Conversion occurs when funds designated for a particular purpose are used for an unauthorized purpose."). While Defendant Arihay may have failed to carry out their unenforceable oral agreement in other instances, the Amended Complaint alleges the money Plaintiff invested was used to purchase and renovate the investment properties. (*See* Am. Compl. ¶¶ 59–62, 74, 87, 97, 107, 119–20).

### B. Conversion of the Investment Properties and Resulting Profits

To the extent Plaintiff alleges Defendants converted real property and/or his share of the resulting profits, the claims fail. To begin, "conversion does not apply to real property." *James*, 2011 WL 1594832, at *6. Even if it did, because the alleged oral agreement is subject to the Statute of Frauds, Plaintiff does not establish any enforceable proprietary interest in the investment properties, or the profits derived therefrom, thus failing to adequately allege the first element of conversion.

On a related note, and as Defendants argue, as with a claim for fraud, "an action for conversion cannot lie where damages are merely sought for breach of contract." *Melwani v. Lipton*, No. 17 Civ. 8308 (PGG), 2019 WL 4572789, at *6 (S.D.N.Y. Sept. 20, 2019) (quoting *Citadel Mgmt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000)) (internal quotation marks omitted).

\* \* \*

Ultimately, Plaintiff fails to allege conversion of the investment funds because they are not specifically identifiable and were not treated in an unauthorized manner. In addition, Plaintiff fails to allege conversion of the investment property and profits because he does not establish an ownership or possessory right to them. Accordingly, I respectfully recommend that Defendants' Motion to Dismiss Plaintiff's conversion claims be granted.

## V.  Unjust Enrichment

Plaintiff brings an unjust enrichment claim against Defendants, arguing they were "enriched at the expense of Plaintiff through profiting from fraudulently obtained investment funds." (Pl.'s Mem. in Opp'n at 42; Am. Compl. ¶¶ 197–99). Defendants argue that Plaintiff fails to state a claim for unjust enrichment because it is "based on the nonperformance of an alleged contract." (Defs.' Mem. in Supp. at 25 n. 15). To the extent Plaintiff seeks return of his investment funds, I respectfully recommend Defendants' Motion to Dismiss Plaintiff's unjust enrichment claim be denied.

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Andrews v. Sotheby Int'l Realty, Inc.*, No. 12 Civ. 8824 (RA), 2014 WL 626968, at *10 (S.D.N.Y. Feb. 18, 2014). The factual allegations in the Amended Complaint, taken as true, adequately establish that Defendant Arihay benefitted from Plaintiff's various investments. However, to the extent Plaintiff pleads a claim of unjust enrichment that is an attempt to enforce the void oral agreement to receive fifty percent of the profits, the claim fails. *Botanical Realty Assocs. Urban Renewal, LLC v. Gluck*, 179 A.D.3d 633, 634 (N.Y. Sup. Ct. 2020); *Komolov v. Segal*, 144 A.D.3d 487, 488 (N.Y. App. Div. 2016). But, where Plaintiff seeks instead the return of the investment funds he gave to Arihay, an unjust enrichment claim may be sustained. *See Chery*

28

*v. Conduent Educ. Servs., LLC*, No. 18-CV-75, 2019 WL 1427140, at *9 (N.D.N.Y. Mar. 29, 2019).

## VI. Constructive Trust

Plaintiff seeks to impose "a constructive trust on all monies transferred to the Defendants' accounts," (Am. Compl. ¶ 225), arguing that a fiduciary duty exists between Plaintiff and Defendant "Arihay arising from the alleged "joint venture." (Pl.'s Mem. in Opp'n at 45). Defendants argue Plaintiff is not entitled to such relief because he fails to adequately allege a fiduciary relationship between himself and Defendants. (Defs.' Mem. in Supp. at 24). Because Plaintiff fails to allege a fiduciary relationship between himself and Defendants based on the alleged "joint venture," I respectfully recommend Defendants' Motion to Dismiss Plaintiff's claim for imposition of a constructive trust be granted.

"The elements of a constructive trust are (1) a fiduciary or confidential relationship; (2) an express or implied promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment." *Kaprov v. Stalinksy*, 145 A.D.3d 869, 871 (N.Y. App. Div. 2016) (quoting *Ning Xiang Liu v. Al Ming Chen*, 133 A.D.3d 644, 644 (N.Y. App. Div. 2016)) (internal quotation marks omitted)). "[T]hese factors, or elements, serve only as a guideline, and a constructive trust may still be imposed even if all four elements are not established" *Sanxhaku v. Margetis*, 151 A.D.3d 778 (N.Y. App. Div. 2017) (quoting *Tyree v. Henn,* 109 A.D.3d 906, 907–908, (N.Y. App. Div. 2013) (alteration in original).

Plaintiff's only argument in support of the existence of a fiduciary relationship is one that would arise from a joint venture. While Plaintiff is correct that partners in a joint venture generally owe each other a fiduciary duty, as determined previously, Plaintiff fails to establish a joint venture existed. As such, Plaintiff fails to allege a fiduciary relationship between Defendant Arihay and

himself. While the factors considered to determine the existence of a constructive trust are mere guidelines, courts often find that failure to allege a fiduciary relationship is fatal to the claim. *Speedfit LLC v. Woodway USA, Inc.*, 432 F. Supp. 3d 183, 220–21 (E.D.N.Y. 2020) (collecting cases).

## VII.  Piercing the Corporate Veil

Plaintiff seeks to hold Corporate Defendants—Pacific 2340 Corp., Royal A & K Realty Group Inc., A&E.R.E. Management Corp., NY Prime Holding LLC, and AG Realty Bronx Corp.—liable for Defendant Arihay's individual actions through the reverse veil-piercing doctrine. (Am. Compl. ¶¶ 209–12). Plaintiff does not plead any facts to support such liability. Therefore, I respectfully recommend Defendants' Motion to Dismiss the issue of reverse piercing the corporate veil be granted.

"As with conventional veil-piercing claims, in a reverse veil-piercing claim, the plaintiff must allege (1) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 297 (E.D.N.Y. 2014) (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. and Trade Servs., Inc.*, 295 F. Supp. 2d 366 (S.D.N.Y. 2003)) (internal quotation marks omitted).

To determine whether the first element has been sufficiently pleaded, courts weigh ten factors:

(1) The absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for person rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8)

whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F. Supp. 2d 361, 375

(E.D.N.Y. 2013) (quoting *JSC Foreign Econ. Ass'n Technostroyexport,* 386 F. Supp. 2d at 464–

65).

The Amended Complaint alleges no factual basis to support a claim that Defendant Arihay exercised complete domination over any of the Corporate Defendants at any time. In fact, regarding reverse piercing the corporate veil, there is not a single allegation referencing the individual Corporate Defendants by name. Rather vague allegations are made against the generic "Corporate Defendants." The very few allegations in the Amended Complaint that make reference to this claim are mere conclusory recitations of the elements. (*See* Am. Compl. ¶¶ 23, 58, 209–12).

Accordingly, I do not consider the second element of the test and I respectfully recommend Defendants' Motion to Dismiss any claim for reverse piercing the corporate veil be granted.

## <u>CONCLUSION</u>

For the reasons set forth above, I respectfully recommend that Defendants' Motion to Dismiss be granted with respect to Plaintiff's (1) Civil RICO claims, (2) common law fraud claims, (3) conversion claims, (4) request to impose a constructive trust, and (4) attempt to reverse pierce the corporate veil. However, I respectfully recommend Defendants' Motion to Dismiss Plaintiff's unjust enrichment claim be denied. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable LeShann DeArcy Hall within fourteen

(14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District

Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human*

*Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

RESPECTFULLY RECOMMENDED

/s/ Ramon E. Reyes, Jr.
RAMON E. REYES, JR.
United States Magistrate Judge

Dated: October 5, 2020
Brooklyn, NY